HUMBLE OIL & REFINING COMPANY ET AL V. RAILROAD COMMISSION OF TEXAS ET AL.

No. 7293. Decided May 10, 1939.
Rehearing overruled June 14, 1939.
(128 S. W., 2d Series, 9.)

*Powell, Wirtz, Rauhut & Gideon, T. H. McGregor, Black & Graves,* and *Chas. L. Black,* all of Austin, *R. E. Seagler, Lee M. Sharrar,* and *Robt. F. Higgins,* all of Houston, for plaintiff in error Humble Oil and Refining Company.

*J. E. Edmundson, J. Lee Dittert,* and *C. D. Duncan,* all of Bellville, for plaintiff in error, Emil Ueckert and others.

It was error for the Court of Civil Appeals to hold that the contract made the Humble Company a public utility for the purpose of carrying out its provisions, and then in holding that it is necessary to strike down material provisions of the contract, including the price clause, because they are inconsistent with the status and duty of the company as a public utility. Producers Transportation Co. v. Railroad Com. 251 U. S. 228; State of Mo. v. Danciger & Co., 275 Mo. 483, 205 S. W. 36, 18 A. L. R. 754; City of San Antonio v. San Antonio Public Service Co., 255 U. S. 547.

*William McCraw*, Attorney General, *F. L. Kuykendall* and *Alfred M. Scott*, Assistants Attorney General, for defendants in error.

The business of furnishing natural gas to the public is a business "affected with a public interest" and, is therefore subject to the State police power of regulation, not only as to practices, but as to rates; that the business as a whole consists of three essential phases commonly known as production, transportation (or transmission) and distribution; and each of these is equally essential to the business as a whole, and so far as furnishing gas to the public is concerned there can be no production without transmission and distribution; no transmission without production and distribution; and no distribution without production and transmission. Moore v. Logan, 10 S. W. (2d) 428; Lone Star Gas Co. v. Municipal Gas Co., 117 Texas 331, 3 S. W. (2d) 790; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Com., 20 Fed. Supl. 248; Gremillion v. Louisiana Public Ser. Co. 186 La. 295, 172 So. 163.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This suit was filed in the District Court of Travis County, Texas, by Humble Oil & Refining Company against the Railroad Commission of Texas, and its members, officially, to set aside and enjoin the enforcement of an order of the Commission attempting to fix the price Humble Oil & Refining Company is to charge M. & M. Pipe Line Company for gas under a written contract theretofore made and entered into between the two companies. M. & M. Pipe Line Company is a corporation chartered and operating as a public gas utility. Humble Oil & Refining Company is, also a corporation, but unless the contract above mentioned makes it such as regards the gas contracted about in this instance, it is not here to be regarded as a public utility corporation. Humble Oil & Refining Company produces

all the gas here involved from lands leased by it from certain private individuals who are interested, if at all, only as ordinary mineral lessors. These individual lessors intervened in the district court on the side of Humble Oil & Refining Company. The case was tried in the district court before the court without the intervention of a jury. At the close of the trial the court entered judgment for Humble Oil & Refining Company, granting it the relief prayed for. On appeal by the Commission to the Court of Civil Appeals at Austin that court reversed the judgment of the district court, and entered judgment for the Commission. 101 S. W. (2d) 614. The case is before the Supreme Court on writ of error granted on application of Humble Oil & Refining Company and intervenors.

As will appear from our discussion of this case, its decision will largely involve a proper construction of the contract above mentioned. This contract was entered into on June 7, 1928, by and between Humble Oil & Refining Company, on the one side, and M. & M. Pipe Line Company, at that time a partnership composed of Clint W. Murchison and R. L. Moyston, on the other side. We hereto attach a copy of the above-mentioned contract, marked "Exhibit." (See this volume, p. 343.)

After such contract was entered into, a corporation was formed, and Murchison and Moyston, with the consent of Humble Oil & Refining Company, conveyed thereto the above-mentioned contract. This newly formed corporation took the name of the partnership, and succeeded to its rights and obligations. It will be noted that by the terms of the contract attached hereto, M. & M. Pipe Line Company agreed to pay Humble Oil & Refining Company 12 1/2 cents per 1,000 cubic feet for the gas contracted for therein. Later this price was reduced by mutual agreement between the two companies to 8 cents. As we understand this record, the 8 cents contract price was in effect between the contracting companies at the time the Commission entered its order fixing 5 cents as the price to be charged by Humble Oil & Refining Company against M. & M. Pipe Line Company.

As we understand this record, generally speaking, Humble Oil & Refining Company and intervenors, who will hereafter be designated "Humble," attacked the Commission order here involved on three main grounds, viz.:

1. On the ground that the Commission was without potential jurisdiction to enter it.

2. On the ground that the Commission did not have before it all necessary parties to authorize it to exercise its rate mak-

ing jurisdiction. As explanatory of this ground, it is contended by Humble that the individuals from whom it holds oil and gas leases were interested, and therefore necessary parties to the proceeding before the Commission, and that they were not there made parties.

3. On the ground that the rate or price of this gas, as fixed by the Commission, was unreasonable and confiscatory.

The record before us shows affirmatively that the district court did not decide the issues involving the questions of parties, or of unreasonableness or confiscation. The trial court simply expressly found and decided that the Commission was without potential jurisdiction in the premises, and on such finding and decision alone, entered judgment annulling the Commission order here involved, and enjoining its enforcement.

By its opinion and judgment, the Court of Civil Appeals held that the Commission had potential jurisdiction to enter this order. Also, that court held with the Commission on the other questions above indicated, and, as a result of such holdings, reversed the judgment of the district court, and rendered judgment in all things upholding the rate order here attached.

By proper assignments in this Court and in the Court of Civil Appeals, Humble contends that our Public Utility Act, Articles 6050 to 6066, both inclusive, does not attempt to subject to the rate making power of the Commission mere producers of gas who sell the same at the point of origin, and who neither transport such gas on, over, or across the public highways of this State, nor exercise the right of eminent domain with reference thereto, nor sell such gas, nor offer it for sale to the public generally; but who merely sell under private contract to one concern.

Also, by proper assignments, Humble contends that if our public utility statutes above mentioned attempt to subject to the rate making power of the Commission the gas producers above described, then such Act is void because the Legislature is without power, by legislative fiat, to change a private business to a public business when it is not such in fact.

By its opinion, the Court of Civil Appeals holds that to concede, though it does not decide, that our public utility law is as contended for by Humble; that is to concede that under our public utility gas statutes, Articles 6050 to 6066, supra, the Commission is given no jurisdiction to fix or prescribe rates for the sale of gas by a mere producer as above defined; still Humble by making this contract, in law, constituted itself a public gas utility under the above statutes as regards the gas

here contracted, and therefore, as to such gas, subjected itself to the statutory rate making jurisdiction of the Commission.

The Commission order here attacked contains the following provision:

"IT IS FURTHER ORDERED by the Railroad Commission that Humble Oil and Refining Company from and after the 10th day of October, A. D. 1935, shall not charge, receive or collect from M & M Pipe Line Company, in excess of $.05 per MCF for natural gas sold and delivered to M & M Pipe Line Company, whether such gas is delivered from the dry gas sand or direct from the gasoline extraction plant, and the M & M Pipe Line Company is hereby ordered not to pay to the Humble Oil and Refining Company for such gas in excess of $.05 per MCF."

It is evident from the above-quoted portion of the Commission order that the Commission has attempted to set aside and annul the contract between these two companies only in so far as it fixes a price that Humble is to charge M. & M. Pipe Line Company for the 'gas embraced therein. It is thus evident that the Commission has attempted to order Humble, a mere gas producer, to sell its gas to M. & M. Pipe Line Company, a public gas utility at a price fixed by the Commission, and that even though the gas is sold at the point of origin.

■ As already shown, the Court of Civil Appeals upholds the above Commission order on the ground that Humble made itself a public gas utility by entering into the contract here involved. In support of its holding, the Court of Civil Appeals cites the case of State v. Lone Star Gas Company (Civ. App., writ refused). 86 S. W. (2d) 484. In the case just cited the rule of law here involved is thus stated:

"The cases are legion which deal with the relationship of two or more corporations from the standpoint of ownership of the capital stock in one by another, and from the standpoint of association together for the purpose of carrying on a single or common business enterprise. The rule is well settled that courts will look through the forms to the realities of the relationship between two or more corporations in order to determine whether each is a separate entity or corporation; or whether their commingled affairs are such as to constitute them one integrated and single business enterprise; or whether, through intercorporate set-up, affiliation, or stock ownership, the purpose is to control the subsidiary corporation or corporations so that they are used as the mere instrumentalities or

agents of the owning corporation or corporations. In discussing the rule, it has been held that while 'ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest * * * or create the relation of principal and agent or representative between the two'; still it has been repeatedly held that such rule is not applicable 'where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies.' Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n., 247 U. S. 490, 38 S. Ct. 553, 557, 62 L. Ed. 1229; United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 64 L. Ed. 760; United States v. Delaware, L. & W. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438. Also, in discussing the rule, the fact that the same persons are directors and managers of two corporations has been given consideration (McCaskill Co. v. United States, 216 U. S. 504, 30 S. Ct. 386, 391, 54 L. Ed. 590), and 'a growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose.' See, also, Gallatin Natural Gas Co. v. Public Service Co., 79 Mont. 269, 256 P. 373. Where one corporation owns or dominates another, it has been often held that 'the independent entity of the two companies is so far disregarded that each is considered as but a part of the indivisible whole.' Kimberly Coal Co. v. Douglas (C. C. A.) 45 F. (2d) 25, 27; In re Kentucky Wagon Mfg. Co. (D. C.) 3 F. Supp. 958; Law v. McLaughlin (D. C.) 2 F. Supp. 601. And 'the rule which appears to be established by these cases is that, where the corporate organization and affairs of one railroad company are controlled and dominated by another railroad company through ownership of stock or lease, the roads must be regarded as identical for the purpose of rate making.' Pontiac, O. & N. Ry. Co. v. Michigan R. R. Com., 203 Mich. 258, 168 N. W. 927, 929.

"A somewhat analogous question was decided by this court in A. T. & S. F. Ry. Co. v. R. R. Com., 77 S. W. (2d) 773, 775 (writ refused), wherein it was held that subsidiary corporations, owned, controlled, and operated by railroads to carry on pick-up and delivery service, did not possess separate legal individuality from the parent corporation, as regards the jurisdiction of the Railroad Commission; and wherein it was held

as follows: "To permit railroads to perform such steps in the process of transportation through other separate legal entities created and owned by them would enable them to defeat the jurisdiction of the commission over such transportation. And in such case where the stock of such separate corporation is owned by the railroad company, and its sole function is merely to help conduct the business of the parent corporation under whose complete control it operates, and in the instant case largely, if not wholly, through the same employees, the subsidiary corporation will be treated as if it were a mere department of the railroad itself'."

The judgment in the Lone Star Gas Company case, supra, was reversed by the Supreme Court of the United States (304 U. S. 224, 58 Sup. Ct. 883, 82 L. Ed. 1304), but the rule of law above announced was not questioned. We here and now approve and adopt as the holding of this Court the above-quoted holding of the Court of Civil Appeals.

■ Under the undisputed record in this case, these two contracting corporations are absolutely separate and independent of each other in corporate set-up. Neither of them owns any stock in the other, and there is no common ownership of stock by the stockholders of the two corporations. Neither of these corporations is interested in the properties, profits, or losses of the other, except, of course, Humble is interested, like any other contracting party, in M. & M. Pipe Line Company being able, financially and otherwise, to take and pay for the gas contracted for by it.

From all that has been said, it is evident that in order to hold that Humble has rendered itself subject to the rate making power of the Commission, as regards the gas included in this contract, it must further be held that such contract by its very terms has operated to associate these two companies together for the purpose of carrying on a single or common business, as regards this gas, and that to the extent that they should be treated, as regards such gas, as one business enterprise.

In this instance, it is conclusive that M. & M. Pipe Line Company is a public gas utility subject to the rate making jurisdiction of the Commission. It is also conclusive that Humble is not a public gas utility subject to the rate making jurisdiction of the Commission, unless this contract makes it such. As already stated, before it can be said that this contract makes Humble a public gas utility, the contract under discussion must legally operate to associate Humble and M. & M. Pipe Line· Company in a common business enterprise, and that

enterprise a public utility gas business. In other words, the contract must operate to make Humble an associate of M. & M. Pipe Line Company as regards the gas utility business of the last-named company.

As we interpret its opinion, the Court of Civil Appeals, in effect, holds that this contract operated to engage these two corporations in a common business enterprise, and that a public gas utility enterprise, subject to the gas rate making jurisdiction of the Commission, because:

(a) The paramount purpose of Humble in making this contract was to create and develop for itself, within the adjacent territory, a domestic consumer market for its gas.

(b) Such contract bound M. & M. Pipe Line Company, itself a public gas utility, to construct such pipe lines as might be necessary to serve certain cities and towns,—in any event, to construct a certain number of miles of pipe line within a stated time.

(c) Such contract required a large forfeit to be deposited by M. & M. Pipe Line Company to insure Humble that it would carry out certain provisions of the contract.

(d) Such contract bound M. & M. Pipe Line Company to proceed with due diligence to secure gas utility franchises for the sale of gas in cities and towns, and to use its best efforts to develop a full gas market.

(e) Such contract bound M. & M. Pipe Line Company to take a daily minimum quantity of gas through its distributing system, or pay the contract price for the deficiency.

(f) Humble secured the performance of M. & M. Pipe Line Company's contractual obligations by taking a lien on all its properties used in the distribution of the gas in question.

▮ We are unable to see how the making of a gas contract, such as is above indicated, by a party otherwise not a gas utility, with a gas utility, can operate to make both contracting parties one gas utility. In other words, we are unable to see how it can be said that Humble, by the terms of this contract, so associated itself with M. & M. Pipe Line Company as to make the public gas utility business of M. & M. Pipe Line Company the common business enterprise of both companies. As we understand this record, Humble is a mere seller of natural gas on its own leased premises, where the gas is produced. All that it is really interested in under this contract is to have M. & M. Pipe Line Company take and pay for the gas it contracted for. The other terms of the contract were undoubtedly provided in order to insure Humble that M. & M. Pipe Line Company would place

itself in position to carry out its contractual obligations. Simply stated, it cannot be held that Humble has made itself a public gas utility by making this contract, unless it can be further held that all persons and parties who contract to sell gas at the point of origin to public gas utilities, by making such gas selling contracts, become public gas utilities subject to the rate making jurisdiction of the Commission. To that length we are not prepared to go. No rule of law, statutory or otherwise, will justify us in doing so.

■ Counsel for the Commission contend that the Commission order here involved is authorized by the provisions of Article 6054, R. C. S. That statute reads as follows:

"Art. 6054. All orders and agreements of any company or corporation, or any person or persons controlling such pipe lines establishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corporation, partnership or joint stock association owning or controlling or operating the gas pipe line affected."

A very casual reading of the above statute will disclose that it only applies to any company or corporation, or to any person or persons who may control pipe lines. We have already demonstrated that in this instance Humble exercises no control whatever over any pipe line owned by M. & M. Pipe Line Company, and has no right to do so. It follows that Article 6054, supra, cannot in any way operate to sustain this Commission order.

It is evident from all that we have said that if the Commission order here involved is to be sustained, it must be alone on the ground that our gas utility statutes authorize the Commission to regulate and fix the price at which a producer of natural gas sells the same on the premises of production to a public gas utility. In other words, for this order to be sustained, it must be because our gas utility statutes authorize the Commission to fix the price at which a mere producer thereof must sell his product to a public gas utility, even though such product is sold by the producer at the point of origin, and even though such producer does not transport such gas on, over, or across the public highways of this State, or exercise the right of eminent domain in regard thereto, or sell the same, or offer it for sale, to the public generally; but merely sells, under contract, to one purchaser, who is a public gas utility. We shall now proceed to discuss other gas utility statutes which we think are pertinent to the issues to be decided.

As already stated, our gas utility statutes are Articles 6050 to 6066, both inclusive. Articles 6053 and 6054 are the statutes which directly define the jurisdiction of the Commission with regard to gas rate making. We have already quoted and discussed Article 6054. Article 6053 reads as follows:

"Art. 6053. The Commission after due notice shall fix and establish and enforce the adequate and reasonable price of gas and fair and reasonable rates of charges and regulations for transporting, producing, distributing, buying, selling and delivering gas by such pipe lines in this State; and shall establish fair and equitable rules and regulations for the full control and supervision of said gas pipe lines and all their holdings, pertaining to the gas business in all their relations to the public, as the Commission may from time to time deem proper; and establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas and the companies distributing or selling it; and prescribe and enforce rules and regulations for the government and control of such pipe lines in respect to their gas pipe lines and producing, receiving, transporting and distributing facilities; and regulate and apportion the supply of gas between towns, cities, and corporations, and when the supply of gas controlled by any gas pipe line shall be inadequate, the Commission shall prescribe fair and reasonable rules and regulations requiring such gas pipe lines to augment their supply of gas, when in the judgment of the Commission it is practicable to do so; and it shall exercise its power, whether upon its own motion or upon petition by any person, corporation, municipal corporation, county, or commissioner's precinct showing a substantial interest in the subject, or upon petition of the Attorney General, or of any county or district attorney in any county wherein such business or any part thereof may be carried on."

As already shown, Article 6054 refers only to pipe lines. Articles 6053 and 6054 are parts of the same Act and subject. When the two are read together, it is evident that both are dealing with rate making as regards pipe lines. If this is not so, Article 6054 is utterly superfluous. If, however, Article 6053 is construed alone, it can furnish no jurisdiction to the Commission to regulate or fix the price of natural gas sold by a mere producer thereof on the premises of production to a public gas utility. Plainly, Article 6053 grants power or jurisdiction to the Commission to fix, establish, and enforce gas rates only as concern pipe lines. No intention is evidenced in

Article 6053 to confer jurisdiction on the Commission to fix or prescribe the price at which a mere producer of gas sells his product on the premises of production to a public gas utility.

■ We have extended this opinion to such a length that we refrain from a more exhaustive discussion of the rate making provisions of our gas utility statutes, supra. We will say, however, that when Articles 6053 and 6054, supra, are read either together, or separately, they demonstrate beyond any doubt that the rate making jurisdiction of the Commission has not been extended to cover mere producers of gas who sell their product at the point of origin. Any other construction of Articles 6053 and 6054 would throw them out of harmony with each other, and also do violence to their plain provisions when considered separately. Also, any other construction of the above-mentioned Articles would, in several particulars, throw them out of harmony with other provisions of our gas utility statutes.

■ It seems to be argued that our gas utility statutes, by necessary implication, confer the power on the Commission to fix the price of gas where it is sold by the producer on the premises of production to a public gas utility. We think that the power to fix prices and make rates by a board, or commission is not to be taken as conferred by implication. Such power must be conferred under statutory or constitutional language that is free from doubt, and that admits of no other reasonable construction. Commercial Standard Ins. Co. v. Board of Ins. Com. (Civ. App., writ refused), 34 S. W. (2d) 343; Siler v. Louisville & N. R. R. Co., 213 U. S. 193. These authorities could be multiplied many times, but they are sufficient. Certainly, it cannot be said that our gas utility statutes, in clear and unmistakable language, confer the power on the Commission to fix prices or rates which private gas producers shall charge public gas utilities.

It is contended by counsel for the Commission that the power of the Commission to fix the price at which a mere producer of gas must sell his product to a public gas utility, even though such gas is sold at the point of origin, should be upheld because the Commission will be greatly hampered and circumscribed in regulating gas utility rates or prices if it cannot also fix the rates or prices that producers charge such utilities for the gas sold thereto. A full answer to this contention is to point to the fact that no statute has conferred such power on the Commission. Furthermore, the same argument could be used to sustain the power of the Commission to fix

prices for all articles, things, and services sold to public gas utilities. Everything that the utility may lawfully purchase must be taken into consideration in fixing the ultimate gas utility rate. We grant that gas utility rates might more effectively be controlled if private gas producers could be compelled to sell gas to such concerns at prices determined and fixed by the Commission; but, as already indicated, that fact does not justify a court in upholding such a power in the absence of any sort of statutory authority. We are dealing at this point with but one primary question,—the power of the Commission to prescribe or fix prices at which mere gas producers must sell their product on the premises of production to public gas utilities. We are not dealing with the power of the Commission to fix prices at which gas utilities shall sell gas to each other or to the general public. We simply hold that our gas utility statutes do not confer on the Commission the power here attempted to be exercised. In so holding we do not want to be understood as in any way attempting to define all the powers in regard to gas rate making that have been, or hereafter may be, conferred on the Commission.

■ At this point we pause to call attention to the fact that our holding to the effect that the Commission is without jurisdiction to tell a mere gas producer what price he must charge for his product when sold on the premises of production to a public gas utility does not mean that the Commission, in all instances and under all circumstances, in fixing gas utility rates, must allow the gas utility affected full credit for the purchase price of the gas purchased by it. In regard to that matter, we think that, in fixing gas utility rates, it is not only the power but the duty of the Commission to inquire into the reasonableness or unreasonableness of the gas utility's gas contracts. Western Distributing Co. v. Public Service Commission, 285 U. S. 119, 53 Sup. Ct. 283, 76 L. Ed. 635; Smith v. Illinois Telephone Co. 282 U. S. 133, 51 Sup. Ct. 65, 75 L. Ed. 255.

Finally, we wish to say that we do not want to be understood as expressing an opinion, one way or the other, on the power of the Legislature to confer on the Commission jurisdiction to fix a price at which a mere producer of natural gas must sell his product on the premises of production to a public gas utility. It is not necessary in this case to decide that question. We simply hold that the Legislature so far has not attempted to confer such jurisdiction on the Commission.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the district court is affirmed.

Opinion delivered May 10, 1939.

Rehearing overruled June 14, 1939.

EXHIBIT.

THE STATE OF TEXAS,
COUNTY OF AUSTIN.

THIS AGREEMENT this day made and entered into by and between Humble Oil & Refining Company, a Texas corporation domiciled in Harris County, Texas, hereinafter called "First Party," and M. & M. Pipe Line Company, a co-partnership composed of Clint W. Murchison of Dallas County, Texas, and R. C. Moyston of Pecos County, Texas, hereinafter called "Second Party," WITNESSETH:

THAT WHEREAS First Party is the owner of oil and gas leases covering lands in what is known as the Raccoon Bend Oil Field in Austin County, Texas, productive of natural gas and may acquire other properties in said field during the life of this agreement productive of natural gas and Second Party plans the construction of a pipe line distributing system for the delivery of natural gas to the neighboring towns and cities and desires to purchase gas from First Party for use in supplying its market through such system;—

NOW, THEREFORE, in consideration of the mutual covenants and obligations herein undertaken and imposed, it is hereby agreed between the parties hereto as follows:

1. Upon and subject to the other provisions hereof, First Party hereby sells and agrees to deliver to Second Party and Second Party hereby purchases and agrees to receive and pay First Party for a quantity of natural gas produced from the properties of First Party above described equal to the full requirements of the distributing system to be built by Second Party as herein contemplated between a minimum of one hundred eighty million (180,000,000) cubic feet per year over the period of the contract (to be delivered in approximately equal quantities of five hundred thousand cubic feet per day) and a maximum of two million (2,000,000) cubic feet per day if and while this quantity is currently available for delivery from said leases and properties after supplying the fuel needs of First Party in its business of producing, transporting and refining oil and gas; provided, however, that Second Party shall not

be required to receive gas before the expiration of ninety (90) days from date hereof, and shall not be required to receive gas in excess of a minimum of two hundred fifty thousand (250,000) cubic feet per day at any time prior to the expiration of six (6) months from date hereof. It is understood that the right of Second Party to require current delivery from day to day of the quantities of gas sold to it hereunder shall be prior and superior to the rights of other purchasers to require current deliveries to them from day to day of gas from said properties under contracts that may be made between such purchasers and First Party. So long as and while First Party has the minimum daily quantities herein agreed to be sold and purchased available for delivery from said properties, Second Party agrees to pay First Party for such quantities as hereinafter provided whether such quantities are taken and received by Second Party or not.

2. First Party specifically reserves the right to manufacture gasoline from the gas produced from said properties and to deliver to Second Party residue gas from its gasoline plant in lieu of natural gas from the wells, and in such event the gasoline plant shall be the point of delivery and measurements shall be made at such point in the manner hereinafter provided for deliveries from the wells or central delivery points.

3. Second Party agrees to proceed with due diligence in an effort to secure franchises for the sale of gas in the towns and cities in the territory near said Raccoon Bend Field and to construct such pipe lines as may be necessary to serve the cities and towns in which franchises are obtained and customers that may be secured by diligent effort, and in any event to construct a minimum of forty (40) miles of main line pipe lines to such neighboring cities within twelve (12) months from date hereof. It agrees further to use its best efforts to develop a full market through such distributing system. Concurrently with the execution hereof Second Party is depositing with First National Bank of Houston, Texas, the sum of Ten Thousand Dollars ($10,000.00) to the credit of both parties hereto and to be held and disposed of by said bank as herein provided. In the event Second Party shall fail to take a minimum of two hundred fifty thousand (250,000) cubic feet of gas per day from First Party hereunder within ninety (90) days from date hereof, or should fail to take a minimum of five hundred thousand (500,000) cubic feet of gas hereunder per day within six (6) months from date hereof, or should fail to complete as much as forty (40) miles of main line pipe lines to neighboring

distributing points within twelve (12) months from date hereof, or during said period of time shall fail faithfully to carry out the other covenants and agreements herein made to be performed by it hereunder, First Party may at its option cancel this contract and require the delivery to it by said bank of said sum of Ten Thousand Dollars ($10,000.00) together with any interest thereon allowed by said bank, the amount of which deposit the parties hereto have agreed shall be liquidated damages to First Party resulting from such failure of performance by Second Party hereunder. The delivery of such sum to First Party by said bank as above provided shall not be taken, however, as settlement or payment for any gas delivered to Second Party hereunder. If at the expiration of twelve (12) months from date hereof Second Party has fully performed all of the covenants and obligations assumed by and imposed upon it hereunder and/or First Party shall not elect to cancel this contract on account of failure of performance, then said bank shall deliver said sum of Ten Thousand Dollars ($10,000.00) together with any interest allowed thereon to Second Party.

4. Except as provided in Paragraph 2 hereof, deliveries of the gas sold and purchased hereunder shall be made by First Party under well pressure at the mouth of each well or, upon election of First Party, at a central point or points in the field designated by First Party. Second Party shall lay its own lines and make its own connections with the wells or other delivery facilities fixed by First Party as above provided at Second Party's cost and expense. All connections shall be made and maintained in a manner and with equipment satisfactory to First Party. Where necessary, valves shall be installed by Second Party to prevent back pressure upon wells. First Party shall install necessary drips and separators. In general the wells and delivery facilities with which connections are made and the manner and proportion of takings from wells and other delivery facilities shall be under the control of First Party. So far as its rights permit, First Party hereby gives and grants to Second Party the right to maintain and operate its said pipe lines and facilities upon, across and over the leases and properties of First Party from which said gas is produced.

5. Second Party at its expense shall install, maintain and keep in good repair at each well with which connection is made or at the other point or points of delivery fixed by First Party as above provided a Westcott orifice daily chart meter or other standard meter approved by First Party, and, if necessary, a

high pressure regulator provided for reducing the pressure, together with appurtenant fixtures as may be required to measure and regulate all gas sold and delivered hereunder. Whenever regulators are installed, the meters shall be located on the low pressure side of same. All meters shall be tested at intervals of approximately thirty (30) days and as near as practicable on the corresponding day of each month. All tests shall be made in the presence of First Party's representative if it desires to have a representative present. First Party may require a test of any meter at any time upon two (2) days' written notice to Second Party. Any meter installed by Second Party found on test to register not more than two per cent. (2%) fast or slow shall be deemed to be correct but if so found to be more than two per cent. (2%) fast or slow, same shall be promptly corrected by Second Party and adjustment in volume of gas delivered shall be made by increasing or decreasing, as the case may be, by an amount equal to the amount of the inaccurate registration. No adjustment shall be made to extend prior to the next preceding test. During the time any meter is out of repair or is being tested or in the event of a sudden failure of any meter to register accurately for any period within the two per cent. (2%) variation allowed herein, if it is not feasible to install another meter, the volume of gas delivered shall be estimated until a new or repaired meter is installed, and adjustment and settlement shall be made at the regular monthly periods on the basis of the amount of gas registered at like pressure for like periods of time when the meter was registering accurately. In no event shall a meter remain out of service for a period of more than thirty (30) days.

First Party may at its election install and maintain meters of standard type corresponding with those required to be installed by Second Party as a check upon any of Second Party's meters. If First Party shall exercise such right, then in the event of failure of Second Party's meters to register accurately at any time (allowing, of course, for the variation above mentioned) the registration of First Party's meters shall be taken as the correct quantity of gas delivered by First Party to Second Party hereunder and same shall not be estimated in accordance with the above provisions; provided, of course, First Party's meters are correct within said two per cent. (2%) variation. Meters so installed and maintained by First Party hereunder shall be tested and adjusted in the same manner as is provided for the testing and adjusting of Second Party's meters. Either party shall have access to the meters of the other party at all reasonable times.

6. All meter charts when removed from Second Party's meters shall be forwarded to the office of First Party in Houston, Texas, for computation and check and shall be promptly returned by First Party to Second Party after check is made. They shall thereafter remain in the permanent files of Second Party and be subject to inspection and check at all reasonable times by First Party.

7. The gas sold and delivered hereunder shall be measured at the point or points of delivery herein provided and the volume of gas so measured shall be computed for purposes of payment on the basis of a standard cubic foot at a pressure of twenty (20) ounces above atmospheric pressure of fourteen and four-tenths (14.4) pounds and at an assumed temperature of sixty degrees (60°) Fahrenheit and an assumed specific gravity of six-tenths (.6).

8. On or before the fifteenth (15th) day of each calendar month Second Party agrees to make payment to First Party at Houston, Texas, for all gas delivered by First Party to Second Party hereunder during the preceding calendar month at a price of twelve and one-half cents ($.125) per thousand cubic feet, such payment to be accompanied by a full statement in detail of daily quantities of gas delivered and of computations involved. In the event the quantity of gas delivered shall not equal the minimum quantities herein provided to be taken by Second Party, such payment shall be for the value of such minimum quantities as above provided. Past due amounts hereunder shall bear interest at eight per cent. (8%) per annum. Second Party hereby gives and grants to First Party a lien upon all its pipe lines and other equipment and physical property comprising its distributing system through which the gas herein sold shall be delivered to market, as security for the payment of all amounts due First Party hereunder, which lien shall be enforcible as any mortgage lien.

9. First Party warrants the gas sold and delivered hereunder against the lawful claims of all persons whomsoever.

10. Notice herein provided to be given to First Party shall be given at its office in Houston, Texas, and notice herein provided to be given to Second Party shall be given at its office in Dallas, Texas. Written notice shall be deemed served within the time required for same to be delivered in the usual course if properly addressed and deposited in the United States mail.

11. If after thirty (30) days' written notice to Second Party by First Party of the breach by Second Party of any of

the covenants assumed by or obligations imposed upon Second Party hereunder Second Party shall fail to remedy such breach and comply with the terms and provisions hereof, then First Party may cancel and terminate this contract. Such cancellation or termination shall not relieve Second Party of the obligation to make payment of any amounts then due First Party hereunder.

12. Unless terminated as herein otherwise provided, this contract shall be and remain in full force and effect during the productive life of the above described leases and properties of First Party to but not beyond a period of ten (10) years from date hereof.

13. This contract is not assignable by Second Party without the written consent of First Party but, subject to this provision, same shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, assigns and successors in interest. At the expiration of the ten (10) year term hereof, Second Party shall have a preferential right to purchase the available quantity of gas from said properties that First Party has for sale not to exceed the amount covered hereby, provided the price and terms offered are agreeable to First Party.

IN TESTIMONY WHEREOF witness the signatures of the parties hereto in duplicate this the 7th day of June, A. D. 1928.

(Signatures of parties omitted.)