TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00127-CV






City Public Service Board of San Antonio and Houston Lighting &


Power Company, Appellants



v.



Public Utility Commission of Texas; Pat Wood, III; Robert W. Gee; Judy Walsh; South


Texas Electric Cooperative, Inc.; Brazos Electric Power Cooperative, Inc.; Texas-New


Mexico Power Company; Lower Colorado River Authority; et al.
, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. 97-02885, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING 







 Appellants City Public Service Board of San Antonio ("San Antonio") and Houston
Lighting & Power Company ("HL&P") (collectively "appellants") appeal from an order of the
trial court granting cross-motions for judgment of defendant the Public Utility Commission of
Texas (the "PUC") (1) declaring valid the "transmission rules," 16 Tex. Admin. Code §§ 23.67, .70
(1999), which guarantee open access and establish a rate formula to determine access charges for
the transmission of wholesale electricity. (2) Appellants assign numerous points of error regarding
the statutory authority under which the rules were adopted, the procedure by which the rules were
adopted, and the substance of the rules themselves. We will reverse the order of the trial court
and render judgment that the transmission rules exceed the statutory authority granted to the PUC,
and are thus invalid.


BACKGROUND

 Before addressing the specific factual background pertinent to this lawsuit, it is
helpful to provide a context for the discussion. The electric industry in Texas has three main
components: generation of power; transmission of that power on high-voltage lines over long
distances; and distribution of power over shorter distances to the ultimate consumer. This lawsuit
concerns the transmission segment of the electric industry, specifically the wholesale transmission
of electric energy. 

 Generally, the incumbent natural monopoly (3) in a given region owns the
transmission network used to transport power to its customers. For example, HL&P owns the
transmission lines it uses to supply power to the Houston area. A voluntary association of these
transmission-providing utilities has developed in Texas. Each of these individual regional
networks of transmission lines are interconnected with other transmission networks across the state
to form a single grid, called the Electric Reliability Council of Texas ("ERCOT"). (4) The ERCOT
grid allows electric power involved in a wholesale transaction to be transferred across the
interconnected transmission networks from any one point on the grid to another. However, not
all wholesale transactions occur between a buyer and seller whose transmission networks connect
directly. Moreover, some generators of electric power own no transmission capability at all. 
Therefore, many wholesale transactions require the use of the transmission infrastructure of other
utilities, which are not parties to the transaction, to "wheel" electric power to its ultimate
destination. (5) And, because the regional units comprising ERCOT are individually owned, an
entity seeking to use the transmission lines of another entity to bring its power to market must seek
the transmission-provider's permission, and most likely must pay a transmission-access fee for use
of the lines. Pricing in wholesale-wheeling transactions has historically been established on an ad
hoc, contractual basis. This creates an opportunity for transmission-providers to influence
wholesale competition through control over pricing and access to their transmission lines.

 In 1995, the Texas Legislature sought to foster competition in the wholesale
electricity market through its passage of the Public Utility Regulatory Act of 1995. See Tex. Util.
Code Ann. § 31.001 (West 1998) ("PURA 95"). The legislature made specific findings that:


The wholesale electric industry, through federal legislative, judicial, and
administrative actions, is becoming a more competitive industry that does not lend
itself to traditional electric utility regulatory rules, policies, and principles. As a
result, the public interest requires that rules, policies, and principles be formulated
and applied to protect the public interest in a more competitive marketplace. The
development of a competitive wholesale electric market that allows for increased
participation by electric utilities and certain non-utilities is in the public interest.



Id. § 31.001(c) (emphasis added). In furtherance of this goal, the legislature enacted specific
legislation to ensure that the transmission segment of the industry would not hinder the
development of competition in the wholesale market. In a section entitled Provision of
Transmission Service, which is the focus of this appeal, the legislature provided:


(a) An electric utility that owns or operates transmission facilities shall provide
wholesale transmission service at rates and terms, including terms of access, that
are comparable to the rates and terms of the utility's use of its system.


(b) The commission shall ensure that an electric utility provides nondiscriminatory
access to transmission service for qualifying facilities, exempt wholesale
generators, power marketers, and other electric utilities.


(c) When an electric utility provides transmission service at the request of a third
party, the commission shall ensure that the utility recovers the utility's reasonable
costs in providing transmission services necessary for the transaction from the
entity for which the transmission is provided so that the utility's other customers do
not bear the costs of the service.



PURA 95 § 35.004 (emphasis added). Moreover, the legislature required that municipally owned
utilities ("MOUs") be regulated for purposes of wholesale competition as investor-owned utilities
("IOUs"). See id. § 35.001 ("In this subchapter, 'electric utility' includes a municipally owned
utility."). (6)

 The legislature authorized the PUC to adopt rules that these goals should be
accomplished:


The [PUC] shall adopt rules relating to wholesale transmission service, rates, and
access. The rules:


 (1) must be consistent with the standards in this subchapter;


 (2) may not be contrary to federal law, including any applicable
decision, rule, or policy statement of a federal regulatory agency
having jurisdiction; 


 (3) must require transmission services that are not less than the
transmission services the Federal Energy Regulatory Commission
may require in similar circumstances;


 (4) must require that an electric utility provide all ancillary
services associated with that utility's discounted wholesale sales
at the same prices and under the same terms as the services
provided to a third person; and


 (5) must require that an electric utility provide all ancillary service
associated with the utility's discounted wholesale sales to a third
person on request.



PURA 95 § 35.006(a). The rules promulgated by the PUC to regulate access to transmission lines
form the dispute in this cause.

 The PUC initially proposed a rule that established a yearly access fee to be paid by
all transmission-customers (7) to the PUC, which would then remit payment to transmission-providers; the access fee would be determined by (1) each transmission customer's percentage of
the peak-load quantity of electricity channeled through the ERCOT grid, and (2) the transmission-provider's transmission cost of service, which consists of the actual costs to a utility of owning
and operating its transmission lines. In other words, the initial rule calculated transmission-access
fees by multiplying the transmission-customer's share of the electricity channeled through the grid
by the transmission-provider's costs to operate its share of the infrastructure that makes up the
entire grid. (8) Several commentators on the rule objected to this formula because the rate
methodology charged a flat rate per megawatt of electricity to be transmitted without regard to the
distance traveled. This formula has been likened to a "postage stamp" because, like first-class
postage, the access fee charges the same rate for transmission of electricity regardless of the
distance traveled by the electricity within the ERCOT grid.

 HL&P, San Antonio, and others (9) urged a rate methodology that calculated fees
based upon the distance traveled by the electricity in a wholesale transaction. They requested a
distance-sensitive "impact fee" rate methodology. This method, the so-called vector-absolute-megawatt-mile ("VAMM") method, measures the impact a given wholesale transaction has on the
ERCOT grid, and thus takes the distance traveled into account. (10) After the notice and comment
period had expired, the PUC promulgated a rule that calculated a "facilities charge for
transmission service" according to both a "postage stamp" transmission access fee component
(70%) and a distance-sensitive impact fee component (30%). (11) See 16 Tex. Admin. Code
§ 23.67(g)(1) (1999). 

 San Antonio and HL&P filed separate suits challenging the transmission rules and
seeking a declaration that the rules were invalid. The two cases were consolidated. Both
appellants and appellees filed motions for summary judgment. After a summary-judgment
hearing, the trial court granted the cross-motions of the PUC and denied those of appellants. San
Antonio and HL&P appeal, presenting four broad issues for our review: (1) whether the
transmission rules exceed the PUC's statutory authority and violate PURA 95; (2) whether the
PUC complied with the rulemaking requirements of the Texas Administrative Procedure and
Practice Act (12) in adopting the transmission rules; (3) whether the transmission rules violate the
takings clause of the Fifth Amendment of the United States Constitution; and (4) whether the trial
court's judgment is erroneously overbroad.


DISCUSSION

The PUC's Statutory Authority

 Both San Antonio and HL&P challenge the statutory authority of the PUC to
promulgate the transmission rules. HL&P makes specific challenges, arguing that the chosen rate
methodology violates a number of statutory requirements, most notably the "comparability" and
"recovery of reasonable costs" requirements of section 35.004. See PURA 95 § 35.004(a), (c). 
We begin our analysis, however, with San Antonio's challenge to the PUC's statutory authority
to establish any transmission-access rate, regardless of the chosen methodology. The thrust of San
Antonio's argument suggests that although the legislature clearly contemplated a role for the PUC
in encouraging competition in the wholesale electricity market, the PUC's role was limited to that
of an overseer of privately negotiated wholesale transactions to ensure open access and
competition. San Antonio concludes that the legislature did not grant to the PUC the power to set
wholesale transmission-access rates, therefore the transmission rules necessarily exceed the PUC's
statutory authority. We find this argument compelling.

 The cardinal rule of statutory construction is to ascertain and follow the legislature's
intent. Citizens Bank v. First State Bank, 580 S.W.2d 344, 348 (Tex. 1979); Minton v. Frank,
545 S.W.2d 442, 445 (Tex. 1976). We ascertain this intent by looking initially at the language
used in the statute. Jones v. Del Anderson & Assocs., 539 S.W.2d 348, 350 (Tex. 1976);
Railroad Comm'n v. Miller, 434 S.W.2d 670, 672 (Tex. 1968). The words in the statute should
be interpreted according to their ordinary meaning; they are not to be interpreted in an
exaggerated, forced, or strained manner. Howell v. Mauzy, 899 S.W.2d 690, 704 (Tex.
App.--Austin 1994, writ denied). Every word of a statute is presumed to have been used for a
purpose, and every word excluded must also be presumed to have been excluded for a reason. 
Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981); Barr v. Bernhard, 562
S.W.2d 844, 849 (Tex. 1978). 

 It is axiomatic that the PUC has no inherent power, but only such powers as are
delegated to it by the legislature in clear and express statutory language, together with any implied
power that may be necessary for the PUC to perform a function or duty that the legislature has
required of the agency in express terms. See Key W. Life Ins. Co. v. State Bd. of Ins., 350
S.W.2d 839, 848 (Tex. 1961); Coastal States Prod. Co. v. Pate, 309 S.W.2d 828, 831 (Tex.
1958); Sexton v. Mt. Olivet Cem. Ass'n, 720 S.W.2d 129, 137 (Tex. App.--Austin 1986, writ
ref'd n.r.e.). Statutory grants of power to administrative agencies must be construed narrowly
when they are claimed to authorize governmental interference with established or traditional
property rights. GTE Southwest Inc. v. Public Utility Comm'n, No. 3-97-148-CV, slip op. at 9
(Tex. App.--Austin July 15, 1999, no pet. h.); 3 Sutherland Statutory Construction, § 62.02 at
312 (1992).

 The Texas Legislature created the PUC in 1975 with the enactment of the Public
Utility Regulatory Act of 1975. See Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, § 1-5, 1975 Tex. Gen. Laws 2331 (Tex. Civ. Stat. Ann. art. 1446c, since amended and codified at
Tex. Util. Code. Ann., tit. 2 (West 1998)). The legislature vested the PUC with the authority "to
fix and regulate rates of public utilities, including rates and regulations for determining the
classification of customers and services and for determining the applicability of rates." See id.
at 2341 (since codified at PURA 95 § 36.001). The PUC thus has authority to establish rates
charged to customers for the sale of electricity. See PURA 95 § 36.001. 

 The legislature amended PURA in 1995 to include the sections previously
described. The question for this Court is whether the amendments to PURA supplied the express
authority necessary for the PUC's promulgation of the transmission rules, which establish
additional rates for the transmission of electricity. The power to fix prices and make rates by a
board or commission cannot be conferred by implication. Such power must be conferred under
statutory or constitutional language that is free from doubt, and that admits of no other reasonable
construction. Humble Oil & Refining Co. v. Railroad Comm'n, 128 S.W.2d 9, 15 (Tex. 1939). 
Based on the following analysis, we believe the legislature did not provide the PUC the necessary
statutory authority. We look first to the legislature's intended scheme to regulate the wholesale
electricity market as set out in the Texas Utility Code.


The Texas Utility Code

 Neither party disputes that the legislature intended to foster competition in the
wholesale market for electricity; the legislature explicitly made such a finding. See PURA 95
§ 31.001(c). However, other sections of the Utilities Code provide support for the proposition
that the intended role for the PUC was one of overseer, not direct regulator of wholesale
transmission rates. The legislature clearly intended that the PUC ensure that transmission access
be non-discriminatory and that the rates charged for transmission access be comparable to those
offered to the transmission-provider's own system. See id. § 35.004(a), (b). This does not
necessarily imply that the legislature intended the PUC to create an entirely new system with
transmission-access rates to be determined originally by the PUC, solely by a rate formula
promulgated by the PUC and fixed by a PUC order.

 Chapter 35, Subchapter A, entitled "Competition and Transmission Access in the
Wholesale Market" contains the specific provisions pertaining to wholesale "wheeling." The
subchapter, containing only nine sections, does not provide express authority to the PUC to
promulgate transmission access rates. In fact, the overall structure of the subchapter supports the
interpretation that the intended role of the PUC is that of final arbiter of private disputes regarding
access charges. Each utility that owns or operates a transmission facility must file a tariff with
the appropriate state or federal regulatory agency having jurisdiction over the utility's transmission
service. (13) PURA 95 § 35.007. Should a dispute arise between two parties over transmission
access rates, the PUC is authorized to compel the parties to engage in alternative dispute
resolution. See PURA 95 § 35.008 ("The commission may require that each party to a dispute
concerning prices or terms of wholesale transmission service engage in a non-binding alternative
dispute resolution process before seeking resolution of the dispute by the commission."). Finally,
if alternative dispute resolution fails to resolve the pricing dispute, the PUC "may require an
electric utility to provide transmission service at wholesale to another electric utility . . . and may
determine whether terms for the transmission service are reasonable." PURA 95 § 35.005(a)
(emphasis added). We believe the subchapter, read in context, contemplates that negotiations
between parties regarding transmission-access pricing be voluntary and contractual. Should a
party be dissatisfied with the outcome of the negotiations, that party may then seek the aid of the
PUC, which can either order the parties to submit to alternative dispute resolution, or may settle
the dispute by establishing a reasonable rate after notice and a contested-case hearing. This
interpretation of the Code is bolstered by the federal example, which is specifically referenced as
the model to be used by the PUC in establishing rules for wholesale power transactions. (14)


The Federal Energy Regulatory Commission

 Many of the provisions adopted by the Texas Legislature in PURA 95 were either
borrowed from federal examples or expressly allude to the federal system of regulating wholesale
transactions. This suggests that the statutory scheme envisioned by the Texas Legislature in
PURA 95 mirrored that previously existing at the federal level, and the statutory authority the
legislature granted to the PUC was intended to reach only to the extent necessary to duplicate the
federal system. (15)

 In 1992, Congress amended the Federal Power Act, expanding the jurisdiction of
the Federal Energy Regulation Commission ("FERC") to include the authority, upon complaint,
to order one utility to wheel power for another. See 16 U.S.C.A. § 824j(a) (West Supp. 1999)
("Any electric utility, Federal power marketing agency, or any other person generating electric
energy for sale or resale, may apply to the Commission for an order under this subsection
requiring a transmitting utility to provide transmission services . . . . No order may be issued
under this subsection unless the applicant has made a request for transmission services to the
transmitting utility that would be the subject of such order at least 60 days prior to its filing of an
application for such order.") (emphasis added); see also 16 U.S.C.A. § 824k (West 1995 & Supp.
1999). FERC does not have jurisdiction to issue an order compelling a transmission-provider to
wheel power unless private negotiations have first failed. Moreover, the issuance of an order must
follow public notice and an evidentiary hearing. See id. § 824(a). Therefore, each order must
necessarily be issued on an ad hoc basis. 


The PUC's Authority to Promulgate the Transmission Rules

 As we have stated, the power to fix prices and make rates by a board or commission
must be conferred by statutory or constitutional language that is free from doubt, and that admits
of no other reasonable construction. Humble Oil, 128 S.W.2d at 15. We have examined the state
statutes and the federal regulatory scheme and have not found a delegation of the necessary
authority. The PUC urges, however, that the legislature expressly granted to the PUC the
authority to adopt rates "relating to" wholesale electric transmission rates, and that this phrasing
is sufficient to confer the necessary statutory authority. See PURA 95 § 35.006(a) ("The
commission shall adopt rules relating to wholesale transmission service, rates, and access.")
(emphasis added). (16) The PUC argues that the statutory phrase "relating to rates" has been
construed as having "a broad scope" and "an expansive sweep." See Morales v. Trans World
Airlines, Inc., 504 U.S. 374, 384 (1992); Continental Airlines, Inc. v. Kiefer, 920 S.W.2d 274,
278-79 (Tex. 1996). The PUC contends that adopting rules "relating to rates" encompasses actual
rate-making. See Morales, 504 U.S. at 384; Kiefer, 920 S.W.2d at 279. We disagree. Such
language is not a delegation of power to fix original rates; it is only a power to regulate conduct
and transactions "relating to" rates. See Humble Oil, 128 S.W.2d at 15.

 Both Morales and Kiefer involved the Airline Deregulation Act of 1978, the
relevant portion of which prohibits states from enforcing any law "relating to rates, routes or
services" of any air carrier. See 49 U.S.C.A. § 1305(a)(1) (1992). The issue in Morales was
"whether the Airline Deregulation Act pre-empted States from prohibiting allegedly deceptive
airline fare advertisements through enforcement of their general consumer protection statutes." 
Morales, 504 U.S. at 378. In holding that state statutes were indeed pre-empted by the federal
statute, the United States Supreme Court construed the phrase "relating to rates" expansively
within the context of preserving federal supremacy. Similarly, in Kiefer, the Texas Supreme
Court applied the holding of Morales to common-law personal injury claims of negligence against
air carriers. See Kiefer, 920 S.W.2d at 275-76. The Texas Supreme Court held that common-law
negligence claims were not pre-empted by the Airline Deregulation Act.

 The PUC argues that the language used by these courts in Morales and Kiefer,
stating that the phrase "relating to rates" should be read expansively, applies in this situation. We
find these two cases to be inapposite. The instant cause involves the alleged rate-making authority
granted by the Texas Legislature to a state agency, the PUC. In Morales and Kiefer, the United
States and Texas Supreme Courts were analyzing the extent of federal exemption of state laws;
both cases turned upon an evaluation of the interface between federal and state authority, not upon
any determination of whether the legislature had granted rate-making authority to a state agency. 
In the Airline Deregulation Act, Congress sought to ensure that effective airline deregulation
would occur by enacting a very broad and sweeping preemption to eliminate the possibility of any
conflicting state regulation. In contrast, in PURA 95, the Texas Legislature had the intention of
deregulating the wholesale electricity market by creating a limited scheme of regulation to ensure
competition by requiring open access to transmission lines and comparable pricing. Put into the
proper context, the phrases are not equivalent. Moreover, we find it incongruous that the
legislature, while purporting to create greater competition in the wholesale market for electricity,
would actually intend in its amendments to PURA to generate more rate regulation than the federal
scheme, even while expressly referencing the federal scheme. See PURA 95 §§ 35.005(c);
35.006(a)(2), (a)(3). 

 The PUC argues that given the many legislative goals of the statute, the requirement
of a uniform rate methodology for establishing transmission-access rates is the most reasonable
alternative for the agency. This may be true. However, the statutory authority for the
establishment of such a scheme simply does not exist at this time. See Humble Oil, 128 S.W.2d
at 15 ("We grant that gas utility rates might more effectively be controlled if private gas producers
could be compelled to sell gas to such concerns at prices determined and fixed by the Commission;
but, as already indicated, that fact does not justify a court in upholding such a power in the
absence of any sort of statutory authority."). We note that the legislature provided a formal
channel for the PUC to "make recommendations for legislation that the commission finds
appropriate to promote the public interest in the context of a partially competitive electric market." 
PURA 95 § 31.003(b)(3) (establishing the Report on Scope of Competition, a bi-annual report to
legislature on scope of competition in electric markets and effect of competition and industry
restructuring on customers). No doubt this channel may be used to request the necessary statutory
authority to implement the PUC's scheme of a uniform transmission-access rate methodology. (17) 
However, at this time that authority does not exist. We sustain San Antonio's point of error
regarding the lack of statutory authority to promulgate the transmission rules. As such, we need
not address appellants' other assignments of error.


CONCLUSION

 The legislature has provided no express authority to the PUC to promulgate the
wholesale transmission rules. An examination of both the state and federal statutory schemes for
the regulation of transmission access in the wholesale electricity market reveals an intent that the
PUC act as an arbiter of disputes arising from privately negotiated contracts. Because the
transmission rules exceed the statutory authority granted to the PUC, we reverse the order of the
trial court and render judgment that the transmission rules are invalid.



 

 Mack Kidd, Justice

Before Chief Justice Aboussie, Justices Kidd and Patterson

Reversed and Rendered

Filed: August 26, 1999

Publish
1. A number of parties intervened on the side of the PUC, including Brazos Electric Power
Cooperative, Inc., Cherokee County Electric Association, City of Austin, Deep East Electric
Cooperative, East Texas Electric Cooperative, Enron Power Marketing, Inc., Robert W. Gee,
Houston County Electric Cooperative, Lower Colorado River Authority, Office of Public Utility
Counsel, Public Utilities Board of City of Brownsville, Rayburn Country Electric Cooperative,
Inc., South Texas Electric Cooperative, Tex-La Electric Cooperative of Tex., Inc., Texas-New
Mexico Power Company, Judy Walsh, and Pat Wood, III. We will refer to all appellees
collectively as the "PUC."
2. These two rules promulgated by the PUC detail the agency's regulation of the
transmission of wholesale electricity and comprise the crux of the dispute. We will refer to them
collectively as the "transmission rules." See 16 Tex. Admin. Code §§ 23.67, .70 (1999). Rule
23.67, entitled "Open-access Comparable Transmission Service," declares as its purpose "to
increase competition in the sale of electric energy at wholesale within the Texas intra-state utility
network, to preserve the reliability of electric service, and to enhance economic efficiency in the
production and consumption of electricity." Id. § 23.67(a). Rule 23.70, entitled "Terms and
Conditions of Open-access Comparable Transmission Service," establishes the specific terms and
conditions under which transmission service is to be provided. See id. § 23.70.
3. The market for electric power has historically resembled a natural monopoly. A natural
monopoly is a firm or industry whose cost per unit of production falls as demand rises. In other
words, a single entity can supply the product more efficiently than multiple entities. 
4. The ERCOT grid does not cover all of Texas. Parts of Texas are served by one of two
other regional grids, the Southwest Power Pool or the Western Systems Coordinating Council. 
The vast majority of Texas, however, both geographically and by population, is served by
ERCOT.
5. The term "wheeling" refers to the act of transferring power over transmission lines.
6. The inclusion of MOUs by the legislature in a scheme of direct regulation by the PUC
is an exception to a MOU's normal exemption from the PUC's jurisdiction. See PURA 95
§ 32.002 ("Except as otherwise provided by this title, this subtitle does not authorize the
commission to: (1) regulate or supervise a rate or service of a municipally owned utility; or (2)
affect the jurisdiction, power, or duty of a municipality exercising exclusive original jurisdiction
in that municipality's regulation and supervision of an electric utility in the municipality."); see
also id. § 33.004.
7. Under the PUC's scheme, transmission-owning utilities are also transmission customers,
and thus subject to the yearly access fee.
8. T = (C)(p/P)

where T = the transmission access fee

 C = the transmission-provider's total cost of transmission

 p = the transmission-customer's peak load

 P = the peak load of ERCOT
9. Texas Utilities intervened as a plaintiff at trial but does not join in this appeal.
10. Calculating the distance electricity will travel in reaching its destination requires a
constructive fiction. Electrons flow freely through the entire ERCOT grid, and will always take
the path of least resistance. Therefore, the VAMM component is determined by computer
modeling rather than an actual calculation of megawatts per mile (MwM).
11. T = [(7/10)(C)(p/P)] * [(3/10)(MwM)]

where T = the transmission access fee

 C = the transmission-provider's total cost of transmission

 p = the transmission-customer's peak load

 P = the peak load of ERCOT

 MwM = the megawatts per mile calculated using the VAMM method
12. See Tex. Gov't Code Ann. §§ 2001.021-.038 (West Supp. 1999).
13. A tariff is defined as "A public document setting forth services of a common carrier
being offered, rates and charges with respect to services, and governing rules, regulations, and
practices relating to those services." Black's Law Dictionary 1457 (6th ed. 1990).
14. Some examples of the legislature's allusion to the federal system of regulating wholesale
wheeling transactions include:


"The commission may not issue a decision or rule relating to transmission service
that is contrary to an applicable decision, rule, or policy statement of a federal
regulatory agency having jurisdiction." PURA 95 § 35.005(c).


"The rules may not be contrary to federal law, including any applicable decision,
rule, or policy statement of a federal regulatory agency having jurisdiction." PURA
95 § 35.006(a)(2).


"The rules must require transmission services that are not less than the transmission
services the Federal Energy Regulatory Commission may require in similar
circumstances." PURA 95 § 35.006(a)(3).
15. We note that Texas is unique among the continental states in having a completely intra-state power grid. Therefore, the federal scheme administered by the Federal Energy Regulation
Commission governs wholesale electricity transactions in all continental states but Texas.
16. Compare the legislative language conferring to the PUC the authority to regulate the
rates charged to retail consumers for electricity: 


(a) The regulatory authority may establish and regulate rates of an electric utility
and may adopt rules for determining:

 (1) the classification of customers and services; and

 (2) the applicability of rates.

(b) A rule or order of the regulatory authority may not conflict with a ruling of a
federal regulatory body.


PURA 95 § 36.001 (emphasis added).
17. We note that the legislature amended section 35.004 in the 1999 legislative session to
include express statutory authority regarding the pricing of wholesale transmission rates according
to the "postage stamp" methodology. See Tex. S.B. 7, 76th Leg., R.S. (1999) (to be codified at
Tex. Util. Code Ann. § 35.004(d)) ("The commission shall price wholesale transmission services
within ERCOT based on the postage stamp method of pricing . . . ."). This new section,
however, does not control the present dispute. In fact, the addition of this new and express
statutory mandate regarding wholesale transmission access rates actually militates against an
interpretation that the necessary authority existed prior to the 1999 amendments.

 We further note that while the single subchapter detailing wholesale competition in the
electric industry contains a mere nine sections, Senate Bill 7 from the 1999 legislative session
restructuring the retail portion of the electric industry creates an additional three chapters (Chapter
39. Restructuring of Electric Utility Industry; Chapter 40. Competition for Municipally Owned
Utilities; Chapter 41. Electric Cooperatives and Competition), encompassing more than 125
sections. While not dispositive of the legislature's intention in delegating authority to the PUC,
the skeletal nature of the former stands in stark contrast to the specific structure established by the
legislature in the latter.



in this appeal.
10. Calculating the distance electricity will travel in reaching its destination requires a
constructive fiction. Electrons flow freely through the entire ERCOT grid, and will always take
the path of least resistance. Therefore, the VAMM component is determined by computer
modeling rather than an actual calculation of megawatts per mile (MwM).
11. T = [(7/10)(C)(p/P)] * [(3/10)(MwM)]

where T = the transmission access fee

 C = the transmission-provider's total cost of transmission

 p = the transmission-customer's peak load

 P = the peak load of ERCOT

 MwM = the megawatts per mile calculated using the VAMM method
12. See Tex. Gov't Code Ann. §§ 2001.021-.038 (West Supp. 1999).
13. A tariff is defined as "A public document setting forth services of a common carrier
being offered, rates and charges with respect to services, and governing rules, regulations, and
practices relating to those services." Black's Law Dictionary 1457 (6th ed. 1990).
14. Some examples of the legislature's allusion to the federal system of regulating wholesale
wheeling transactions include:


"The commission may not issue a decision or rule relating to transmission service
that is contrary to an applicable decision, rule, or policy statement of a federal
regulatory agency having jurisdiction." PURA 95 § 35.005(c).


"The rules may not be contrary to federal law, including any applicable decision,
rule, or policy statement of a federal regulatory agency having jurisdiction." PURA
95 § 35.006(a)(2).


"The rules must require transmission services that are not less than the transmission
services the Federal Energy Regulatory Commission may require in similar
circumstances." PURA 95 § 35.006(a)(3).
15. We note that Texas is unique among the continental states in having a completely intra-state power grid. Therefore, the federal scheme administered by the Federal Energy Regulation
Commission governs wholesale electricity transactions in all continental states but Texas.
16. Compare the legislative language conferring to the PUC the authority to regulate the
rates charged to retail consumers for electricity: 


(a) The regulatory authority may establish and regulate rates of an electric utility
and may adopt rules for determining:

 (1) the classification of customers and services; and

 (2) the applicability of rates.

(b) A rule or order of the regulatory authority may not conflict with a ruling of a
federal regulatory body.


PURA 95 § 36.001 (emphasis added).
17. We note that the legislature amended section 35.004 in the 1999 legislative session to
include express statutory authority regarding the pricing of wholesale transmission rates according
to the "postage stamp" methodology. See Tex. S.B. 7, 76th Leg., R.S. (1999) (to be codified at
Tex. Util. Code Ann. § 35.004(d)) ("The commission shall price wholesale transmission services
within ERCOT based on the postage stamp method of pricing . . . ."). This new section,
however, does not control the present dispute. In fact, the addition