MAINLINE INVESTMENT
CORPORATION,
Plaintiff,

v.

F. C. GAINES, Jr., Defendant.

Civ. A. No. CA 3–74–906–G.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 5, 1976.

---

Joe B. Harrison, Wynne & Jaffe, Dallas, Tex., for plaintiff.

W. R. Griffitts, Dallas, Tex., for defendant.

## OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

### I.

### The Cast and Script

This is a suit seeking damages for a claimed breach of a contract to pay commissions for locating a purchaser of crude oil. High hopes of oil brokers have been dashed in the wash of an oil embargo, government regulations of oil and a precipitate increase in the price of crude oil.

'he players in this game of price rou-e include the plaintiff, Mainline In-tment Corporation, a Liberian corpo-.ion (Mainline), Joseph Pankhurst, a .nadian oil broker here an agent for Mainline (Pankhurst), F. C. Gaines, Jr. (Gaines), an oil broker of Dallas, Texas, and Larcon Petroleum, Inc. (Larcon), a purchaser of oil.

In the fall of 1973 Gaines received an oral "commitment" from an unidentified broker to sell each day up to 1,000 barrels of number 4 crude oil for 365 days. However, Howell Refining Company of San Antonio, Texas (the supplier) was, apparently, not committed to sell at a fixed price. In early November Gaines informed Pankhurst of the oil he had "available" and shortly thereafter Pankhurst located a prospective buyer—Larcon.

While it is not clear which came first, the original commission agreement and the agreement between Gaines and Larcon for the sale of oil were achieved at about the same time. Regardless, it is undisputed that Gaines and Pankhurst met in Houston, Texas on November 13, 1973 with Larcon, resulting in the execution of a contract of sale between Gaines and Larcon (the purchase order). On November 14, 1973, Gaines and Pankhurst, acting for Mainline, reduced their commission agreement to writing.

The purchase order called for the sale of 1,000 barrels (42,000 gallons daily) for 365 days, of oil meeting prescribed specifications at 24¢ per gallon with shipment commencing November 15, 1973. The purchase order contained the following term (of nine printed terms):

"(7) Neither party hereto shall be held liable for failure to perform or delay in performing this contract unavoidably resulting from war, fire, strikes, revolution, mobs, governmental interference, floods, storms, or any act of God or other extraordinary cause over which he or it has no control." (Plaintiff's Exhibit 3.)

The commission contract of November 14, 1973 provided in pertinent part:

"This is to acknowledge that you have earned a commission in relation to the purchase order from Larcon Petroleum, Inc. # 5338⅛ dated November 13, 1973, a copy of which is attached hereto, in the sum of 2.3125¢ per gallon.

"Said payment is to be made in favor of Corporate Bank & Trust for Mainline Investment Corporation upon receipt of payment from Larcon Petroleum, Inc., and will be made promptly from said receipted payments.

"This agreement shall apply to any increase in quantity or extension of time relative to said purchase order and to any assignment or novation of said purchase order.

"In the event of a breach of said purchase order by the seller or his assignee the said commission shall immediately become due and payable as to the quantity set forth in the annexed purchase order."

The oil supplier's price was 17.75¢ per gallon. Larcon's purchase price was 24¢, resulting in a spread for the brokers of 6.25¢ per gallon. 1.625¢ per gallon was to be paid to "Three Seven Trading Corporations" (whose involvement is not otherwise mentioned by the litigants) with the balance of 4.625¢ per gallon to be divided between Gaines and Mainline. This calculation is the source of the 2.3125¢ commission rate found in the November 14, 1973 commission contract. These calculations are also helpful in evaluating certain commission payments claimed to have been made by Gaines in satisfaction of the commission contract. But this comes later.

The hurried execution of the commission contract and purchase order was quickly followed by a dispute, an almost predictable difficulty because the critical factor in the success of the commission contract was the maintenance of the difference between the twenty-four cent purchase price fixed by the purchase order and the 17.75¢ price which, alas, was not a constant but a variable. By November 26, 1973, Gaines had told Mainline that his supplier was raising the price by 2¢ per gallon. An exchange of telephone calls and telex communications resulted in a second commission contract dated December 10, 1973 (December 10 commission contract). This contract expressed an agreement that the new commission rate would be 1.645¢ per gallon and also provided:

"In connection with your Telex dated December 3, 1973, and further evidence which was furnished to you December 10, 1973, relating to the sale of # 4 oil pursuant to Purchase Order No. 5338 from Larcon Petroleum, Inc. to us, we agree to pay to you a reduced sum of .01645¢ per gallon of future deliveries taken by Larcon, subject to price increases from the refinery to us, and as agreed upon between the refinery, ourselves and Larcon.

"Since Larcon has agreed to accept an increase in price under their Purchase Order No. 5338 from 24¢ to 34.25¢ per gallon for future deliveries, our agreement to you dated November 14, 1973, shall be reduced to the payment of the sum equal to 1.645¢ per gallon and not 2.3125¢ per gallon as indicated therein.

"If we are compelled by the refinery to pay further increases from time to time which may affect the payment of the aforementioned profit to you, we agree to consult with you prior to making any further arrangements with Larcon."

Shipments to Larcon continued and payments aggregating some $48,491.52 were made to Mainline. These payments were, as dictated by the November commission contract, made to Corporate Bank & Trust. During this same time period of December and January, Gaines also paid the sum of $14,314.88 to Pankhurst. Whether the payments to Pankhurst were in satisfaction of Gaines' obligation under the commission contracts or other obligations is disputed. Gaines admits that he owed Mainline the sum of $57,730.19 for deliveries of oil actually made to Larcon. Thus, crediting the Mainline debt with the payments made to Pankhurst would result in an overpayment by Gaines.

In late January 1974 shipments to Larcon under the purchase order stopped. Whatever be Larcon's view of this termination of its purchase order, there is no evidence that Larcon complained.

Gaines claims that he was unable to obtain oil at a price sufficiently low to meet the terms of the purchase order. This claim is made despite an agreement between Gaines and Larcon to increase its purchase price to 34.5¢ per gallon, made in December 1973. Moreover, Gaines' testimony must be viewed against the circumstance that Larcon continued to buy oil at the 35¢ price range after Gaines ceased to sell under the purchase order. Moreover, substantial quantities of number 4 fuel oil were sold by GTM Corporation to Larcon in January and February 1974. Interestingly, GTM was then owned in equal parts by three men, one of whom was Gaines.

From these facts the following claims emerge. Mainline asserts that its commission was fully earned when Larcon executed the purchase order on November 13, 1973 with the commission payments to be made as deliveries were made and that the second commission contract of December 10, 1973 only reduced the commission rate from 2.3125¢ to 1.645¢ per gallon; that Gaines breached his contract with Larcon, thereby accelerating his full commission obligation. Finally, Mainline denies that Gaines' debt should be reduced by the $14,314.88 paid by Gaines to Pankhurst.

Gaines claims that the November 14 commission contract obligates him to pay commissions only for oil delivered, which he has more than done; alternatively, that the underlying purchase order was not breached and any obligation he might otherwise have fails by the very terms of the November 14 commission contract; that the November 14 commission contract was modified by an oral agreement[1] on the same day the November 14 agreement was executed. Finally, while Gaines' contention is not clear,

he appears to also urge that the December 10, 1973 agreement made clear any earlier confusion regarding Gaines' obligation to pay commissions upon undelivered oil.

## II.

### Gaines' Breach of the Purchase Order

The first critical issue is whether Gaines breached the purchase order contract when he stopped deliveries in late January 1974. Gaines relies upon the extraordinary cause language of the force majeure clause found in the purchase order contract. While Gaines' counsel made references in his argument to the condition of the oil industry in the period of late November through January 1974, the record evidence of unusual conditions is scanty. Gaines' counsel urges the Court to take judicial notice of the "governmental intervention" into the oil industry as well as the shortage of fuel oil "at this time". Rule 201 of the Federal Rules of Evidence relaxed the rules controlling judicial notice only for notice of "adjudicative facts". The Advisory Committee's Notes adopt Professor Davis' definition.

"When a court or an agency finds facts concerning the immediate parties—who did what, where, when, how and with what motive or intent—the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts . . . They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses." 2 Administration and Treatises 353.[2]

■ Whatever be the status of the economic events of late 1973 and their impact upon the oil industry generally, the issue in this case is whether they

---

1. It is unnecessary to resolve the issues presented by Gaines' claims of a contemporaneous oral agreement contrary to the written terms of the November 14 commission contract. The statute of frauds and parol evidence rule would in any event probably be insurmountable.

2. By this definition a particular occurrence or phenomenon is not always a non-adjudicative, legislative fact, but may, because of the proof required in a given case, become an adjudicative fact. Cf. *Borden's Co. v. Baldwin*, 293 U.S. 194, 210, 55 S.Ct. 187, 79 L.Ed. 281 (1934).

were, after November 14, 1973, an "extraordinary cause" of Gaines' inability to perform under the purchase order contract. These economic events are thus in this case adjudicative facts within the meaning of Section 201 Federal Rules of Evidence. Most, if not all, of these events meet the two tests of 201(b): "being generally known locally" and " . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned . . ."

█ The undisputed facts would include a series of increases in oil prices by the Organization of Petroleum Exporting Countries (OPEC) beginning in the summer of 1973 and followed by the Arab Oil Embargo of October, 1973. Obviously, all these events preceded the November 13, 1973 purchase order contract. Fourteen days after the November 13, 1973 commission contract came the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. Sec. 751 et seq. (1975 Supp.).

While these events are in the Court's opinion "extraordinary" events in the sense that they are unusual and of world dimension, that observation does not answer our inquiry into whether these were extraordinary within the meaning of the purchase order contract or equally pivotal whether they caused Gaines' inability to continue oil deliveries to Larcon.

a) Extraordinary

█ In the context of an escape clause in a contract an extraordinary event must have been one that was not foreseeable. A draftsman can frame a foreseeable event as an express condition to contractual duty. Force majeure clauses represent draftsmen's efforts to adjust contractual duty in the event of unforeseeable events and presumably have as their purpose the adjustment of contractual duty upon the calamitous and unanticipated event which makes performance impossible. That in the absence of agreement intervening economic hard-

ship is usually held to be insufficient legal justification for nonperformance[3] does not answer this issue, but does provide a backdrop against which the clause is to be construed.

Certainly a sudden and precipitate change in the price of a commodity can hardly be held to constitute an "extraordinary" event. The central purpose of the price agreement is to fix the price and consequently the risk of price fluctuation. In any event it is unnecessary to decide whether the events after the November 13 contract were extraordinary, because Gaines must also prove a causal relationship between any "extraordinary" event and his non-delivery, which he has not done.

b) Cause

Here evidentiary voids cannot be filled with Section 201 notice. The impact of world events upon this transaction does not meet Section 201(b) because such a causal nexus is neither generally known nor capable of accurate and ready determination by resorting to sources whose accuracy cannot reasonably be questioned. Moreover, the record evidence is that Larcon continued to purchase number 4 fuel oil from GTM Corporation after Gaines stopped deliveries under the purchase order. These purchases were at the approximate price level of 35¢ per gallon, a price which Larcon had agreed to in December for all deliveries thereafter under the November purchase order. This strongly suggests not only Larcon's continued need for oil but its availability (at least to some suppliers) at the price level of the amended purchase order contract.

In sum, Gaines has breached the purchase order, at least as it was originally written.

III.

The Result of Gaines'

Breach of the Purchase Order

---

3.  *See, e. g., Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir. 1964).

■ The question now becomes whether Gaines contracted to pay commissions upon undelivered oil. Gaines argues that his obligation under the purchase order, at least as modified by the December 10, 1973 agreement, was to pay to Mainline commissions only upon delivered oil. Understandably Mainline relies heavily upon the paragraph of the November contract which provides:

"In the event of a breach of said purchase order by the seller  .  .  . the said commissions shall immediately become due and payable as to the quantity set forth in the annexed purchase order."

Gaines points to language that provides that payment (of commissions) ".  .  . will be promptly made *from said* receipted funds  .  .  ." (emphasis supplied.)

A fair reading of the agreement in its entirety leads to the reasonable conclusion that the "source of payment" language was not fixing the amount of commission but its time of payment. The agreement commences with the words "  .  .  . you have earned a commission" and of course at that time no deliveries had been made. Gaines' construction would not only avoid the plain import of the payment language but would also give no meaning to the first sentence of the letter agreement. At that juncture the written agreement between the parties was not so ambiguous as to require (or allow) extrinsic evidence to establish its meaning.

If matters ended here, Gaines' liability would be established. But on December 10, 1973 Gaines and Mainline modified their commission agreement. This time the unqualified obligation to pay commissions became a commitment "to pay to you a reduced sum  .  .  . per gallon of *future* deliveries *taken* by Larcon, *subject to price increases* from the refinery to us, and as agreed upon between the refinery, ourselves and Larcon." (emphasis supplied). While Gaines also agreed to "consult" with Mainline before negotiating any new prices with his supplier or Larcon, his obligation to pay

commissioners was "subject" to further increases. How the commission was to be adjusted if the refinery increased the price to Gaines was not specified in the agreement. Mainline's position, as stated in the November 30, 1973 Telex (Defendant's Exhibit 8A) was ".  .  . our entitlement as a commission, it is in fact a share of your profit on the sale to Larcon Petroleum as calculated between us  .  .  ." This admission of Mainline is sufficient to supply a strong clue as to how Gaines' obligation under the December 10, 1973 contract was ".  .  subject to further increases".

Regardless, the December 10, 1973 contract called for payments upon ".  .  future deliveries taken by Larcon  .  ." The agreement simply states no obligation to pay for undelivered oil. While Mainline's counsel ably secured testimony from Gaines, both in his deposition and at trial, to the effect that the only change in the commission contract made by the December 10, 1973 commission agreement was the amount of commission, the testimony is not as damaging as it appears at first blush. While Gaines' contentions are opaque at best, he contended that even under the November 14, 1973 commission agreement he was not obligated to pay commissions upon undelivered oil. While that claim is without merit as otherwise pointed out, the consistency of his position avoids the inference Mainline's counsel claims from that testimony—that the obligations to pay commissions for undelivered oil as required by the November 14, 1973 agreement was not altered by the December 10, 1973 agreement.

Under the November 14, 1973 commission contract, Gaines was at risk. He had effectively shorted the oil market by committing to deliver oil in the future for a fixed price, oil which he did not then have. As the price of oil moved upward, his cost of cover increased and his profit potential decreased. But faced with this problem he succeeded in negotiating a new contract dated December 10, 1973 which also put Mainline's commission at the risk of the market. Given

the volatile climate of the time it is unlikely that Gaines had intended to place himself in the position he did by signing the November 14, 1973 agreement, signed without benefit of legal advice and prepared by Mainline's counsel. It is also unlikely that Gaines did not intend to extricate himself from his risky position by the December 10, 1973 agreement.

Mainline's effort to now collect its commission in full for the aborted transaction runs afoul of the December 10, 1973 agreement not unlike Gaines' difficulty in overcoming the language of the November 14, 1973 agreement.

In sum, after December 10, 1973, Gaines was obligated to pay commissions only upon oil he delivered under the purchase order contract. Whatever may have been his liability to Larcon for the breach, he has none to Mainline.

## IV.

### Gaines' Liability for Commissions

### On Delivered Oil

■ It is undisputed that Gaines owed Mainline the sum of $57,730.19 for commissions for the oil actually delivered. It is also undisputed that Mainline has received $48,491.52 and that Gaines had paid the additional sum of $14,314.88 to Pankhurst. If the $14,314.88 paid to Pankhurst is credited to the Mainline debt, there is an overpayment of $5,076.21. On the other hand, if the payments to Pankhurst were not in satisfaction of Gaines' obligations to Mainline but were in payment of Gaines' obligation to Pankhurst on other matters, then Mainline is due $9,238.67, together with interest at the legal rate of 6% from its due date. While such due date is not clear, it has been owed from at least February 1, 1974, if owed at all. The Court found the explanations of both Pankhurst and Gaines regarding the payments to be less than satisfactory, although Gaines' testimony was specific with regard to his receipt of instructions from Pankhurst as to the method of payment. And on November 12, 1973 Main-

line had clothed Pankhurst with written authority "to execute on our behalf all directives and docuemtns (sic) relating to any transactions entered into with your firm." (Defendant's Exhibit 11). While this broad grant of authority provides legal justification for Gaines having followed the instructions of Pankhurst, Gaines' story otherwise suffers two fundamental deficiencies. First, to credit Gaines' testimony would mean that Gaines was, as late as January 10, 1974 (see Plaintiff's Exhibit 6) still effectively paying a commission rate of 2.3125¢, despite his considerable and successful efforts to obtain a reduction in early December of that commission rate to 1.645¢. Second, this would result in an overpayment by Gaines of some $5,076.21. While Gaines suffered from a lack of legal advice at the time of the November transactions, he appears to have had an abundance of accounting advice. This Court found Gaines to be too sophisticated and "tough" a businessman to have been so charitable with this business acquaintance. While the identity of Mainline and the payments to and through Pankhurst in many ways raises more questions than answers—questions which in all likelihood will surface again in other contexts—they are not before this court. In sum, the Court finds that the $14,314.88 was not paid to Pankhurst in satisfaction of Gaines' debt to Mainline; that Gaines has failed to pay $9,238.67 in commissions upon oil delivered to Larcon.

## V.

### Attorney's Fees

■ The commission contract makes no provision for the award of counsel fees. This Court, sitting in a diversity case, is applying Texas law. Under Texas law, attorney's fees are not recoverable as a matter of course by a prevailing party. Article 2226 V.A.T.S. provides here the sole authority for any award of counsel fees. Article 2226 provides:

"Any person, corporation, partnership, or other legal entity having a

valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured or suits founded upon a sworn account or accounts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such persons or corporation, he may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees . . . ."

While Gaines' counsel did not answer the claim for attorney's fees, the Court holds that under Texas law counsel fees are here recoverable. Article 2226 allows recovery of counsel fees in suits for recovery of sums due for personal services rendered. While a corporation could not before 1971 render personal services within the meaning of Art. 2226, it may now do so. See, *Tenneco Oil Co. v. Padre Drilling Co.*, 453 S.W.2d 814 (Sup.Ct.1970).

Counsel to the Plaintiff testified that Mainline has incurred approximately $3,729.20 for attorney's fees through trial, representing an hourly rate of $45 per hour. While counsel to the Plaintiff is relatively young at the bar, the Court found his presentation to reflect thorough preparation and the fee he has submitted to Mainline to be most reasonable. Accordingly, Mainline should also recover of Gaines its counsel fees.

## CONCLUSION

Thus, this saga ends virtually as it began. The profits remain substantially where they were in the beginning—in the creative minds and hopes of the promoters. Judgment will be entered simultaneously herewith.