

# Opinion

### In The

# Court of Appeals

### For The

# First Supreme Judicial District of Texas

---

## NO. 01-87-00137-CV

---

**VALERO TRANSMISSION COMPANY, Appellant**

**V.**

**MITCHELL ENERGY CORPORATION, Appellee**

FILED IN
COURT OF APPEALS
HOUSTON, TEXAS
AUG 3 1 1988
KATHRYN COX
CLERK

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 85-05219**

---

Valero Transmission Company ("Valero"), a natural gas pipeline company, appeals from a temporary injunction order requiring that it purchase and take, pending a trial on the merits, certain quantities of gas from Mitchell Energy Corporation ("Mitchell"), a gas producing company, pursuant to its gas purchase agreement with Mitchell.

In the temporary injunction order, the trial court found that on March 21, 1975, Mitchell and Valero entered into a gas purchase contract that as amended, has a contract term of 20 years from February 1, 1981. The court found that under the provisions of this contract, Valero agreed to:

(i) exercise its best efforts in good faith, and in cooperation with [Mitchell], to request deliveries of gas that will maintain [Mitchell's] leases in force and effect; and to

(ii) actually purchase from [Mitchell] quantities of gas sufficient to permit [Mitchell] to prevent drainage of gas from [its] leases by producers other than [Mitchell].

The court found that Valero breached these agreements, and that as a result, Mitchell's leases in three fields subject to the contract were being drained by offsetting producers. The court found that as a further result of the breach, Mitchell was in imminent danger of losing 11 leases that were subject to the gas purchase contract.

Based on the foregoing findings, the court required that Valero, pending a final hearing on the merits, do the following:

(i) To prevent drainage of gas from Mitchell's leases, Valero is required to purchase and take gas from designated wells "in an amount equal to the full prorated allowable assigned to each such well by the Railroad Commission of Texas [but not more gas than a particular well is physically capable of producing]"; and

(2) To prevent Mitchell from losing its leases, Valero is required to purchase and take from designated wells "the amount of gas which each such well can physically produce in one day, [but not to exceed the prorated allowable assigned to such well]." Valero is further required to make any necessary nominations to the Texas Railroad Commission so that its purchases and takes under this paragraph ... will not cause Valero to violate Texas law.

Under the gas purchase contract, Mitchell dedicated exclusively to Valero all of its gas reserves in designated lands and leases in several counties. Mitchell agreed to sell and deliver

-2-

to Valero, and Valero agreed to purchase and take, all gas produced from said lands and leases during the 20-year term of the contract. The contract specifies the quantities, quality, and prices to be paid for the gas, and contains clauses designed to protect Mitchell against drainage and against the loss of its leases because of lack of production. The contract also contains a force majeure clause and a provision that the contract is deemed to be modified by any contrary Texas law. The contract was amended in 1978 to include additional acreage, and again in 1981, when Mitchell agreed to drill 15 additional wells in return for a higher price per unit for gas produced from the new wells.

Beginning in 1983, Valero no longer complied with the minimum purchase and take requirements of the gas purchase contract, and thereafter, Mitchell brought suit alleging breach of contract. Ancillary to the main action, Mitchell sought a temporary injunction, which is the subject of this appeal.

We first address Valero's contention that the trial court lacked subject matter jurisdiction to enter the temporary injunction. Valero contends that Mitchell's suit constitutes a collateral attack on the rules, regulations, and orders administered by the Texas Railroad Commission, and that the district courts of Travis County have exclusive jurisdiction to hear such suits. See Alpha Petroleum Co. v. Terrell, 122 Tex. 257, 59 S.W.2d 364 (1933); Tex. Nat. Res. Code Ann. sec. 85.241 (Vernon 1978).

We overrule Valero's contention. Mitchell's suit was for breach of contract, and its action for a temporary injunction merely sought to compel Valero's continuing performance of certain terms of the gas purchase contract pending a trial on the merits. Mitchell's suit does not challenge or seek an exemption from any rule, regulation, or order of the Texas Railroad Commission. Although the Texas Railroad Commission is given general statutory authority to regulate the production of gas, the Commission does not have authority to hear contract disputes or to abrogate the parties' respective rights under the gas purchase contract. See Railroad Comm'n v. City of Austin, 524 S.W.2d 262 (Tex. 1975); see also Humble Oil & Refining Co. v. Railroad Comm'n, 133 Tex. 330, 128 S.W.2d 9 (1939); Railroad Comm'n v. United Gas Pipe Line Co., 358 S.W.2d 907 (Tex. Civ. App.--Austin 1962, writ ref'd n.r.e.); A. Anderson, The Texas Approach to Gas Proration and Ratable Take, 57 U. Colo. L. Rev. 199, 220-21 (1986). Indeed, the Texas Railroad Commission, in adopting 16 Tex. Admin. Code secs. 3.30, 3.34 (1987), has itself expressly acknowledged that these rules "shall not affect existing contractual rights and obligations between parties." 12 Tex. Reg. 536 (February 17, 1987).

Mitchell sought temporary specific performance of certain terms of a contract, pending a trial on the merits, and such suit could properly be determined by the district court of Harris County, notwithstanding the fact that the parties are generally subject to the regulatory authority of the Railroad Commission. We accordingly hold that the trial court has subject matter

jurisdiction over this contract dispute and over Mitchell's ancillary action for temporary injunction. See Zimmerman v. Texaco, Inc., 413 S.W.2d 387 (Tex. 1967), refusing writ n.r.e. on 409 S.W.2d 607, 612-13 (Tex. Civ. App.--El Paso 1966); Looney v. Sun Oil Co., 170 S.W.2d 297, 300 (Tex. Civ. App.--Texarkana 1943, writ ref'd).

We therefore overrule Valero's seventh point of error.

We next consider Valero's contentions that the trial court abused its discretion in granting the temporary injunction. The purpose of a temporary injunction is to preserve the status quo, and one seeking such relief must show a probable right to recover on the merits at the eventual trial, irreparable injury in the interim if the injunction is not granted, and the absence of an adequate remedy at law. Arkansas Louisiana Gas Co. v. Fender, 593 S.W.2d 122, 123 (Tex. Civ. App.--Tyler 1979, no writ). Valero contends that Mitchell failed to sustain its burden of showing these elements.

In its first point of error, Valero asserts that Mitchell failed to demonstrate a probable right to recover under the provisions of the gas purchase contract. Under this point, Valero argues that it has taken gas under the contract in accordance with its market demand and that any contractual requirement that it purchase additional amounts would constitute a violation of Texas law. In addition, Valero contends that Mitchell failed to present evidence of probative value showing that it would sustain damages from Valero's failure to take minimum quantities of gas. In its

related point of error nine, Valero asserts that the temporary injunction order requiring performance of the contract, as written, violates the law and is therefore void and unenforceable.

A trial court is clothed with broad discretion in deciding whether to issue a temporary injunction to preserve the rights of the parties pending a final trial on the merits. Texas Foundries, Inc. v. Int'l Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460 (1952). On review of a temporary order, a trial court's decision will be reversed only if the record shows a clear abuse of discretion. Id. at 462; see Davis v. Huey, 571 S.W.2d 859 (Tex. 1978).

Thus, in reviewing the temporary injunction order, we are not permitted to decide questions of factual insufficiency or reach the underlying merits of the case. Id. at 861-62. Nor may we substitute our judgment for that of the trial court. Indeed, we must draw all reasonable inferences in favor of the trial court's decision. Davis v. Bache Halsey Stuart Shields, Inc., 630 S.W.2d 754, 757 (Tex. App.--Houston [1st Dist.] 1982, no writ).

We first conclude that the contract, and the temporary injunction order enforcing it, is not illegal on its face, so that Valero had the burden of demonstrating its defense of illegality. We may find an abuse of discretion in the trial court's holding against Valero only if illegality was established as a matter of law.

Valero's claim of illegality is based upon the premise that there was no market demand for the gas Valero contracted to

purchase from Mitchell. Valero argues that a market for gas is defined by price; that the price at which it would have to sell contract gas, based on its cost, is over $4 per unit; that currently natural gas is selling on the spot market for under $2 per unit; and thus, there is no existing market for $4 gas. Valero contends that any contractual requirement that it take and pay for gas in excess of its market demand violates the law.

The Texas Railroad Commission has statutory jurisdiction to govern and regulate all oil and gas wells, common carrier pipelines, persons owning or operating pipelines, and persons owning and operating oil and gas wells in Texas. See Tex. Nat. Res. Code Ann. sec. 81.051 (Vernon 1978). However, as discussed above, the Railroad Commission has no authority to abrogate contract rights. Nor do the Railroad Commission rules purport to affect contract rights. 12 Tex. Reg. 536. A previous attempt to preempt contractual provisions that were inconsistent with a Railroad Commission interpretive order was struck down by the District Court of Travis County on a complaint that the Commission had exceeded its authority. See Dallas Production Co. v. Railroad Comm'n, No. 260,641 (Travis Cty. Dist. Ct., June 10, 1977).

Even if we were to assume that the Railroad Commission rules cited by Valero did affect the parties' obligations under the contract, we find that Valero has not proven that complying with the contract would violate the law.

The primary purpose of regulating natural gas is to prevent waste, to promote conservation, and to compel ratable

production for protection of correlative rights in a common reservoir. See Tex. Nat. Res. Code Ann. sec. 86.001 (Vernon 1978). The statutory definition of "waste" includes the production of gas in excess of reasonable market demand for the type of gas produced. Section 86.012(7) (Vernon Supp. 1987).

Under current Texas Railroad Commission rules, the production or purchase of gas in excess of "market demand" is prohibited. 16 Tex. Admin. Code secs. 3.30 and 3.34. These rules also prohibit discrimination by a purchaser between producers in a common field and establish a priority system for the purchase of different types of natural gas. Id.

The Texas Railroad Commission sets production allowables for gas that are based on monthly estimates of market demand by gas purchasers. These "buyer nominations" must show expected gas requirements from each field from which the buyer purchases gas. Sections 3.30(c), (d). Based on this information, the Commission divides the total allowable monthly production in a field among the wells in that field and assigns a "prorated allowable" to each well. The allowables are computed so as to accord each producer the opportunity to produce its fair share of the total gas to be produced from the field that month.

The monthly demand nominations from gas purchasers such as Valero must include estimates for each field of gas from which the purchaser takes gas. Thus, Valero's nominations, its own estimates of demand, will affect the Commission's determination of total market demand for any month, as well as the prorated

allowable assigned to Valero's producers. If actual demand turns out to be more or less than the estimates, the allowables may be adjusted accordingly.

There was testimony that the Texas Railroad Commission determines the "total market demand" for any month by considering the volume of gas generally salable on the market as shown by gas purchaser nominations. In this case, there was evidence that the gas market demand, and Valero's total volume of purchased gas, dropped considerably from 1981 to 1986. But there was also evidence showing that special marketing programs of Valero's parent company replaced 30-40% of that lost volume, and these special arrangements made it possible for Valero to move its expensive gas, even though the market price for gas was lower.[1]

In two of the fields subject to the parties' contract, Mitchell is the only producer in the field that has connections to Valero's pipeline, so discrimination is not an issue there. In the fields that Mitchell shares with other of Valero's producers, Valero contends that because it is required to take gas ratably among those producers, it cannot purchase contract amounts only

---

[1]. There was testimony that the market for expensive gas consisted mostly of long-term contracts or "captive" ... markets. To hold up its sales of higher-than-market-price gas, Valero sometimes will sell a downstream purchaser a "mix" of differently priced gas, e.g., 20% of the purchaser's requirements from expensive contract gas and 80% from cheaper special marketing program gas. The average price for the gas is thus lower than it would be if Valero sold only the expensive gas.

from Mitchell. That is, it must take the same percentage of production capability from all producers in a field.

The trial court's injunction order sets out its requirements with specific reference to Railroad Commission standards. It first requires Valero, in order to prevent drainage from Mitchell's wells, to take the full prorated allowable assigned to each well by the Commission. A well's prorated allowable is generally the amount of gas that the well is allowed to produce and that a buyer may purchase from it. However, allowables are not an absolute legal limit on production in any specific month. See Tex. Nat. Res. Code Ann. sec. 86.090 (Vernon Supp. 1987). Section 86.090, for example, provides for temporary overproduction and underproduction of wells to adjust owners' correlative rights to produce and sell gas from a common reservoir. Further, Mitchell presented evidence that the rules relating to allowables are flexibly interpreted by the Commission based on individual circumstances and based on the policies underlying regulation of oil and gas in Texas. Valero's contentions that the injunction would require it to illegally take gas in excess of market demand and discriminate in favor of Mitchell are speculative. See Universal Resources Corp. v. Panhandle E. Pipe Line Co., 813 F.2d at 80. Valero has not demonstrated that requiring it to take the prorated allowable of gas from Mitchell's wells would result in a violation of the law.

The court's temporary injunction order further requires Valero, in order to maintain Mitchell's leases in effect, to take

-10-

an amount of gas equal to one day's deliverability each month, subject again to each well's prorated allowable. That is, the order limits Valero's required taking to the well's prorated allowable if one day's production would exceed that allowable. Because the monthly well production allowables are based upon buyer gas nominations, the temporary injunction also requires that Valero make any necessary nominations to the Railroad Commission so that its purchases and takes will not cause it to violate Texas law. Again, the injunction's requirements are defined in terms of complying with all applicable laws, and Valero has failed to conclusively demonstrate its defense that the court's order requires it to violate the law.

Valero also relies on the force majeure clause in the contract, asserting that any failure of performance on its part was "due to causes beyond its reasonable control," which it could not have prevented by the exercise of due diligence. It argues that under Commission rules, it had only slight control over the price it had to charge for its gas, and that neither party could control downstream market demand for gas at the high contract price. Thus, Valero argues, the force majeure clause in the gas purchase contract excuses its performance and precludes Mitchell's right to a temporary injunction. At the very least, Valero asserts, it should not be required to pay above market price for the gas that the injunction requires it to take.

We overrule these assertions. A force majeure clause does not relieve a contracting party of the obligation to perform,

unless the disabling event was unforeseeable at the time the parties made the contract. See Gulf Oil Corp. v. Federal Energy Regulatory Comm'n, 706 F.2d 444, 452 (3rd Cir. 1983), cert. denied, 464 U.S. 1038 (1984); Mainline Inv. Corp. v. Gaines, 407 F. Supp. 423, 427 (N. D. Tex. 1976). An economic downturn in the market for a product is not such an unforeseeable occurrence that would justify application of the force majeure provision, and a contractual obligation cannot be avoided simply because performance has become more economically burdensome than a party anticipated. Alamo Clay Prod., Inc. v. Gunn Tile Co., 597 S.W.2d 388 (Tex. Civ. App.--San Antonio 1980, writ ref'd n.r.e.); see Measday v. Kwik - Kopy Corp., 713 F.2d 118, 126 (5th Cir. 1983); Mainline Inv. Corp., 407 F.Supp. at 427.

Indeed, the uncertainty of future market prices is often the motivation for entering into a long-term contract. The primary purpose of a price agreement is to fix the price and consequently to avoid the risk of price fluctuation. 407 F.Supp. at 427. Thus, a sudden or significant change in price, or the fact that one of the parties may gain or lose during a particular period of the contract, is not sufficient to constitute an extraordinary, unforeseeable event that would excuse performance under the force majeure clause. Id.

In summary, we find that the court-ordered requirements are reasonable and do not require Valero to violate the law. We therefore conclude that Valero has failed to establish its claims of illegality, and we overrule points of error one and nine.

-12-

In its second and third points of error, Valero argues that Mitchell was not entitled to temporary injunctive relief, because Mitchell failed to establish probable irreparable harm and the absence of an adequate remedy at law.

There was evidence from which the trial court could reasonably have decided that drainage was occurring from several of Mitchell's wells subject to the contract. Mitchell's expert witness presented data on pressure comparisons over time and related it to production from wells offsetting Mitchell's wells in the same field. He also explained other methods of attempting to measure drainage and justified why his technique was more reliable.

Mitchell also presented evidence that all of its leases were beyond their primary term and that the land covered by at least 11 leases would automatically revert back to the holders of the mineral interests if there was no production from the leased tracts. There was testimony that Mitchell had spent millions of dollars acquiring the leases and drilling and operating these wells.

Although the probative value of Mitchell's evidence was seriously challenged by Valero, the trial court could reasonably have found from the evidence that because of drainage, Mitchell would probably suffer a permanent loss of gas from beneath its leased tracts, and that due to such drainage, it would likely be deprived of a chance to recover its fair share of gas from the common reservoir. There was also evidence supporting the finding that Mitchell was threatened with the loss of 11 leases due to lack

of production. The court could reasonably have decided that the extent of Mitchell's probable loss was beyond precise measurement, so that it would be extremely difficult to quantify Mitchell's right of compensation for such loss. Thus, the record supports the trial court's conclusion that Mitchell would suffer imminent, irreparable injury in the absence of temporary injunctive relief, and that it lacked an adequate remedy at law.

Because we find that there is some evidence of probative value to support the trial court's decision, we overrule Valero's second and third points of error. See Matuszak v. Houston Oilers, Inc., 515 S.W.2d 725, 728 (Tex. Civ. App.--Houston [14th Dist.] 1974, no writ).

In its sixth point of error, the appellant contends that the court abused its discretion in granting relief that disrupts the status quo and exceeds that necessary to prevent irreparable harm. Essentially, Valero complains that even if it should be required to comply with the provisions of the temporary injunction, it should not be compelled to pay the contract price, but rather should be permitted to pay the market price for the gas purchased. Valero argues that the "high prices" required by the order are unnecessary to prevent lease loss or drainage, and thus the temporary injunction order grants relief beyond that required to preserve the status quo.

There is evidence in the record that the interim prices at which the temporary injunction ordered Valero to purchase gas were the last noncontested prices Valero had paid for Mitchell's

gas under the contract. Given this circumstance, we conclude that the trial court's temporary injunction order tends to preserve the status quo. The court did not abuse its discretion in setting the prices that Valero must pay for gas pending a trial on the merits.

The sixth point of error is overruled.

In its fifth point of error, Valero contends that Mitchell was not entitled to equitable relief because it failed to demonstrate that it had "clean hands." Valero asserts that Mitchell had other potential buyers of gas available, i.e., special marketing programs of its own and of other companies that buy gas cheaply on the spot market, and that Mitchell unreasonably refuses the opportunity to sell its gas at a price $2 to $4 under the contract price. Valero argues that these alternative markets would afford Mitchell wholly adequate relief and would not require Valero to illegally discriminate in favor of Mitchell over its other producers.

We overrule this point, because there was no showing that Mitchell engaged in any wrongful conduct relating to the gas purchase agreement or that it did anything that brought about the alleged breach. Indeed, there was evidence that on several occasions, when Valero took no gas under the contract, Mitchell eventually agreed to sell its gas at a lower price to Valero's own special marketing program, VIGAS, in an attempt to avoid some of its anticipated damages. Mitchell's refusal to re-negotiate its gas purchase contract with Valero certainly does not constitute wrongful conduct precluding its right to equitable relief.

In its eighth point of error, the appellant contends that the temporary injunction was an abuse of discretion because it will impede the public interest by forcing Valero to violate the laws relating to the oil and gas industry. In its fourth point of error, the appellant asserts summarily that Mitchell failed to sustain its burden to demonstrate a balance of equities in its favor, because Mitchell allegedly sought to take action contrary to Texas law and Commission rules, which supersede any inconsistent contract provisions. We have found previously found that Valero has not met its burden of demonstrating that the temporary injunction order is illegal, or that it will force Valero to violate any law or regulation. Points of error four and eight are overruled.

The trial court's temporary injunction order is affirmed.



FRANK G. EVANS
Chief Justice

Justices Cohen and Hoyt also sitting.

Do not publish. Tex. R. App. P. 90.